**In the Matter of MID STATE WOOD PRODUCTS COMPANY, Bankrupt.**

**No. 69 B 184.**

United States District Court, N. D. Illinois, W. D.

Feb. 19, 1971.

Kenneth F. Ritz, Alford R. Penniman, Williams, McCarthy, Kinley & Rudy, Rockford, Ill., for the bankrupt.

## MEMORANDUM AND ORDER

CAMPBELL, Senior District Judge.

This matter comes before the Court on petitions filed by Daniel D. Doyle, Trustee of the Bankrupt Estate, ("Trustee"), Breece Plywood, Inc., ("Breece") and National Acceptance Company of America, ("NAC") to review an order entered by the Referee in Bankruptcy establishing the order of priority to an account or accounts receivable owed to the Bankrupt in which each of the petitioners claimed an interest.

The facts are stated in the briefs submitted by the parties and the Referee's Certificate As To The Record, which includes 35 enumerated documents, including the Bankrupt's petition and schedules and the pleadings. The Bankrupt was engaged in the manufacture of wooden cabinets in the city of Rockford, Illinois. Among the Bankrupt's customers was Ampex Corporation to which it had sold and delivered a quantity of cabinets for which Ampex was indebted at the date of bankruptcy in an amount claimed to be the sum of $47,265.22.

The Referee's order provides:

That from the proceeds realized from Ampex Corporation there shall be paid to the following parties the stated amounts in the order of priority listed:

1. To BREECE PLYWOOD, INC., the sum of $14,265.05 prior to the two parties hereinafter named.

2. To NATIONAL ACCEPTANCE COMPANY OF AMERICA, the sum of $13,745.65 prior to the Trustee hereinafter named.

3. To DANIEL D. DOYLE, Trustee the sum of $19,254.52.

All three parties have petitioned for review of the order.

A stipulation between Breece, the Trustee and NAC as to certain of the facts was filed on July 30, 1969. The Referee made certain findings which are dated September 15, 1969. Petitions for rehearing were filed by all three parties and on June 19, 1970 the Referee entered his Findings on Reconsideration.

In essence, the respective positions taken by the three claimants are as follows:

## BREECE

In December, 1966 the Bankrupt entered into a security agreement with Breece to secure payment for plywood to be sold and delivered by Breece to the Bankrupt which would use it in the construction of cabinets for sale to the Bankrupt's customers. In October, 1968 the Bankrupt owed Breece $49,555.99 for plywood delivered up to that time. A new procedure was thereupon adopted whereby the Bankrupt upon receiving an order from its customer Ampex would immediately assign a portion of the order to Breece. Breece would then ship the plywood to the Bankrupt to construct the cabinets ordered by Ampex and the Bankrupt would notify Ampex to make payment at Breece's bank in New Albany (Union National Bank of New Albany, Indiana). The bank would deduct the amount assigned to Breece and forward the balance to the Bankrupt.

At the date of bankruptcy Ampex owed the Bankrupt $47,265.22 on nine orders for cabinets which the Bankrupt had constructed from plywood furnished by Breece. Breece filed an application to reclaim the nine accounts receivable, but the Referee held that Breece was entitled only to $14,265.05 and that the remaining $33,000.17 was an asset of the Bankrupt Estate, subject only to the lien of NAC (hereinafter discussed). Breece requests that it be found to have a first lien on the assets (accounts receivable) to the extent of its claim in the amount of $40,179.55.

## NAC

NAC made a series of loans to the Bankrupt pursuant to security agreements beginning in June, 1963. NAC would advance money to the Bankrupt and in return would take "a security interest in all of the Bankrupt's present and after-acquired equipment, inventory, general intangibles and proceeds of the foregoing (as these terms are defined in the Uniform Commercial Code of Illinois)." (Application of NAC filed March 11, 1969.)

The Referee found that $13,745.65 still remains unpaid to NAC and that it is entitled to said sum from the proceeds realized from Ampex Corporation after payment of the first lien of Breece but prior to any payment therefrom to the Trustee. NAC requests that a hearing be held before the Referee to determine the amount of reasonable attorneys' fees and other costs and expenses which should be added to the $14,265.05.

## THE TRUSTEE

The Trustee argues that Breece has waived its lien rights and is not entitled to any payment out of the proceeds of the Ampex accounts. He also contends that the validity of the liens claimed by NAC and the amount allowed to it were not correctly determined and that NAC is entitled at most to a lien in the amount of $915.20.

As is clear from the facts and theories of the parties recited above, the primary issue presented for review is that of the relative priorities of Breece, NAC and the Trustee to the Ampex account. The parties do not dispute that, as of the date of bankruptcy, Breece had a valid claim against the Bankrupt in the sum of $40,179.55 for plywood which it sold to the Bankrupt which in turn used it to fabricate the cabinets which it sold to Ampex. The Security Agreement entered into between Breece and the Bankrupt on December 6, 1966 covered,

among other things, present and after acquired inventory and accounts, and a financing statement was filed on December 13, 1966.

On November 2, 1968, Breece sent to NAC a written notice that it would be acquiring a purchase money security interest in the plywood and cabinets of the Bankrupt.

■ It appears from the record and is apparently not disputed by the parties that NAC was first in point of time to file a financing statement covering present and after acquired inventory and proceeds of the Bankrupt.[1]

Nevertheless, the parties, by their respective petitions and briefs, appear to agree that even though NAC was apparently the first to file, that fact is not determinative of the relative priorities as between NAC and Breece. Both NAC and the Trustee concede that until such time as the bankrupt executed its assignment to Breece of future accounts on November 7, 1969, Breece had a prior right in the Bankrupt's proceeds from its inventory by reason of its purchase money security interest in the inventory pursuant to § 9–312(3) UCC.

NAC and the Trustee contend, however, that Breece relinquished its purchase money priority portion with respect to at least a portion of its claim when it agreed to a new procedure for payment under the procedures adopted pursuant to the Assignment of Future Accounts for repayment of its advances.

Their theory is that by taking a specific assignment of certain Ampex accounts pursuant to the assignment of future accounts, Breece abdicated its priorities which it had as a purchase money lender under its pre-existing perfection of its security interest in these accounts.

As stated above, this position was adopted by the referee in his order of June 25, 1970.

■ Upon review I find no basis in law to support this finding. The Assignment of Future Accounts document executed by the bankrupt for the benefit of Breece expressly reserves to Breece whatever rights and priorities which previously accrued to Breece under its previous perfection. The assignment expressly states that it is designed to supplement rather than supplant the earlier Security Agreement and filing. The manifest purpose of the Supplemental Assignment was to enhance Breece's policing procedure over those accounts specifically assigned to it and to implement its mode of collection by providing for notice of the assignment to the account debtor and by designating a collecting bank to receive and disburse payment. The mere fact that a secured party chooses to police a portion of the proceeds in which he is perfected without similarly policing the balance should not jeopardize his priority position with regards to such balance. A contrary result would serve only to resurrect on an arbitrary basis an unwelcome spector of the rule in Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991 (1925) which the Uniform Commercial Code has effectively sought to modify.

Section 9–205 of the Code explicitly provides that the security interest is not invalidated or fraudulent as against competing creditors where the secured party allows the debtor to retain complete control over the disposition of collateral including proceeds. The Official Code Comment upon this section delineates the intent of the drafters to repeal the rule of Benedict v. Ratner insofar as

---

1. The underlying Security Agreement between NAC and the bankrupt, however, does not appear to grant a security interest in proceeds, but does grant a security interest in the accounts of the debtor as well as his inventory. However, between the Security Agreement which covers the Ampex account as primary collateral, and the financing statement, which covers the Ampex account as a proceed of inventory, the requirements for perfection under the Uniform Commercial Code §§ 9–203, 204, 303, 402 have been met, notwithstanding the failure of the Security Agreement to provide for proceeds of inventory and the failure of the financing statement to provide for accounts.

it imposed the burden upon accounts receivable or inventory financiers to police proceeds or risk the invalidation of their security interest.

The authorities cited by NAC and the Trustee in support of that portion of the Referee's order limiting the priority of Breece only to a percentage of the specific accounts assigned to Breece are not applicable to the facts of this case. In re Forney, 299 F.2d 503 (7th Cir. 1962); Clovis National Bank v. Thomas, 77 N.M. 554, 425 P.2d 726 (1967); and First National Bank and Trust Co. of Oklahoma City v. Stock Yards Loan Co., 65 F.2d 226 (8th Cir. 1933).

In re Forney was decided in 1962 and did not purport to look to the Uniform Commercial Code. If its holding were applied after adoption of the Uniform Commercial Code, then its effect would be to deny an inventory financier a right to proceeds of sales since such sale would be in the ordinary and usual course of business, and with consent whether expressed or implied.

Section 9–306(2) of the Code expressly reserves the right to proceeds notwithstanding authorization to sell the primary collateral. Whether the sale was authorized is made determinative only of the secured party's right to follow the collateral after sale affecting his priorities as against the purchaser but in no manner affects his interest in the retained proceeds as against competing creditors. This construction of the statutory provision is emphasized in the Official Code Comment upon that provision. See UCC, Official Code Comment § 9–306(2) at par. 2.

The Stock Yards Loan Company case is less in point since that case dealt only with the interest of a secured party in the collateral which was actually sold. The right of the secured party to the proceeds which the debtor received in exchange of the sale was not even questioned. The same is true of the *Clovis* case.

As previously discussed, the Uniform Commercial Code is explicit in preserving the priority of the secured party to the proceeds notwithstanding his consent to the sale of the primary collateral and further notwithstanding his consent to the debtor's unrestricted use and disposition of these proceeds so long as they remain identifiable. See UCC §§ 9–306, 9–205 and the Official Code Comments upon these sections.

Authorization to sell collateral at best affects the secured party's rights against the subsequent purchaser but not as against the creditor.

Accordingly I find and conclude that the order of the Referee restricting the priority of Breece's secured claim to $14,265.05 is clearly erroneous. If the priority position of Breece is recognized, it must be given effect to its entire claim.

However, there does appear to be a substantial question concerning the priority of Breece over NAC in the Ampex accounts since that priority is predicated wholly upon the status of Breece as a purchase money lender. Although not raised by the parties hereto, the law is not at all clear as to whether the priority of a purchase money lender as against a competing inventory financier extends to proceeds of the goods to which the purchase money security interest applies. See 2 Gilmore, Security Interests in Personal Property § 29.5. This issue may be considered on remand.

I should further observe that this question is being presently considered by the review committee for Article 9 of the Uniform Commercial Code. Under their present draft of the proposed revisions of Article 9, the relative priorities of the secured seller as against competing inventory or accounts receivable financiers would be determined by Section 9–312(5) of the Code on the basis of who was first to file. The effect of Section 9–312(3) and (4) dealing with the special priority of the purchase money lender would thus be restricted to the

primary collateral alone. See Permanent Editorial Board for Uniform Commercial Code, Review Committee for Article 9 of the Uniform Commercial Code, Preliminary Draft No. 2, Feb. 1, 1970 at pp. 30–32. Of course, this draft of the proposed revisions has not yet been adopted nor would it necessarily have binding retroactive effect.

If it should be determined that the purchase money priority of Breece extends to proceeds, then Breece is clearly entitled to recover the full amount of its indebtedness in the sum of $40,179.55 from the Ampex account as against NAC and the Trustee. However, if it should be determined that the purchase money priority of Breece does not extend to proceeds, Breece's rights against the Trustee would nevertheless remain paramount for the full extent of its claim against the Bankrupt since it would, in any event, have a perfected security interest as to that entire amount which, therefore, establishes its priority over the trustee. UCC §§ 9–301, 9–108 and 9–306. See also, In re Grain Merchants of Indiana, 408 F.2d 209 (7th Cir. 1969). The determination of its status as a purchase money secured party would only affect its relative priority over NAC, its competing secured creditor, who apparently was the first to file against this collateral. The adjudication of the relative priorities as between Breece and NAC will determine who as between these two will be the first to satisfy its debt out of the Ampex fund. The second in priority will, in any event, be fully entitled to all of the remaining surplus.

As to the remaining issues presented by the Petitions of NAC and the Trustee, particularly, NAC's claim for attorneys' fees and the Trustee's claim that the amount of NAC's lien was not correctly determined by the Referee, I find that the Findings and Conclusions of the Referee are supported by the evidence and the authorities and are not clearly erroneous.

This cause is hereby remanded for proceedings consistent with this memorandum and order.