In re Jacqua FIGGERS and Ernestine Figgers, Debtors.

Jacqua FIGGERS

and

Ernestine Figgers, Plaintiffs,

v.

DAYTON POWER AND LIGHT EM-PLOYEES FEDERAL CREDIT UNION, Defendant.

Bankruptcy No. 3--88--03106.
Adv. No. 3--89--0235.

United States Bankruptcy Court,
S.D. Ohio, W.D.

Nov. 6, 1990.

Gary C. Schaengold, Dayton, Ohio, for plaintiffs/debtors.

Stephen D. Miles, Dayton, Ohio, for defendant/creditor.

## DECISION AND ORDER FINDING DEFENDANT IN VIOLATION OF AUTOMATIC STAY PROVISIONS OF 11 U.S.C. § 362 AND ORDERING TURNOVER OF FUNDS

WILLIAM A. CLARK, Bankruptcy Judge.

Before the court is a motion of Jacqua and Ernestine Figgers (Debtors) to find Dayton Power and Light Employees Federal Credit Union (Defendant) in violation of the automatic stay provisions of Section 362 of the Bankruptcy Code. The court has jurisdiction pursuant to 28 U.S.C. § 1334 and the standing order of reference in this district. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

### FACTS

This proceeding has been submitted to the court for decision on the basis of stipulated facts and memoranda of law in lieu of trial. The following facts are derived from the uncontradicted portions of the parties' pleadings, a "Stipulation of Facts" filed by the parties, and a copy of Ernestine Figgers' share account with Dayton Power and Light Employees Federal Credit Union:

1) On January 3, 1985, Ernestine Figgers (f.k.a. Ernestine Brown), who maintained a share account with Dayton Power and Light Employees Federal Credit Union, filled out an application to obtain a loan of $1,500 from Defendant. On the line designated "Collateral Offered" was a handwritten notation—"signature";

2) On January 15, 1986 the loan application was approved by Defendant's Credit Committee;

3) At some time (a stamped date of January 28, 1986 appears), Ernestine Figgers signed a form entitled "Revolving Credit

Application, Note, Plan, Agreement and Truth–in–Lending Disclosure." The form contains the following, small-type, language:

8. (A) If an amount has been entered on a "Revolving Credit Request Voucher" as "Pledged Shares and/or Deposits," the person signing such voucher hereby pledges such amount of shares and/or deposits, whether held individually, jointly or in trust, as security for any and all moneys advanced under this plan and interest accrued thereon and authorizes the credit union, in the case of default, to apply same to payment of said obligation.

(B) The undersigned hereby pledge all shares and/or deposits and payments and earnings thereon which they now or hereafter may have, whether held individually, jointly, or in trust, as security for any and all moneys advanced under this plan and interest accrued thereon and authorize the credit union, in the case of default, to apply same to payment of said obligation. However, this pledge does not include amounts held under an "individual retirement account," "Keogh plan," or as an "All–Savers Certificate."

4) Defendant "did not make special mention of the share pledge" to Ernestine Figgers (Doc. No. 16);

5) Subsequently, $1,500 was deposited by Defendant in the account of Ernestine Figgers, and as authorized by Ms. Figgers, $15 per week was deducted from her payroll check by Defendant to repay the loan;

6) On September 1, 1988, Ernestine and Jacqua Figgers filed a petition in bankruptcy pursuant to chapter 13 of the Bankruptcy Code. Debtors did not list Defendant as a creditor. The balance of the share account available to Ernestine Figgers, on the date she filed her petition in bankruptcy, was $39.91, and the balance owing on the revolving credit loan account was $1,435. Payroll deductions of $15 per week continued after Debtors filed their petition;

7) On May 25, 1989, Debtors' chapter 13 case was converted to a chapter 7 proceeding. At that time, the share account had a balance of $303.26 and $1,043.62 was owed on the revolving credit loan;

8) Debtors amended their bankruptcy schedules on June 13, 1989 to include Defendant as an unsecured creditor in the amount of $1,019.59. On that date there was a balance of $496.49 in the share account and $1007.52 remained unpaid on the loan;

9) Subsequently, Defendant placed a freeze on the account and refused to release any of the funds in the account to Debtors;

10) The parties have stipulated that Defendant "did not have ill will or malice against" the Debtors [Doc. No. 16].

## CONCLUSIONS OF LAW

Debtors contend that Defendant's refusal to release the funds in the share account constitutes a violation of the automatic stay provisions of Section 362 of the Bankruptcy Code, and that Defendant should be ordered to turn over the contents of the account to Debtors. Defendant maintains that it holds a lien with respect to the account or that it is entitled to a setoff. Additionally, Defendant maintains that § 362 does not protect the account because it is not property of Debtors' bankruptcy estate.

Initially, it is necessary to examine the legal consequences of the conversion of Debtors' case from a chapter 13 proceeding to chapter 7. Section 348 of the Bankruptcy Code provides that:

(a) Conversion of a case from a case under one chapter of this title to a case under another chapter of this title constitutes an order for relief under the chapter to which the case is converted, but, except as provided in subsections (b) and (c) of this section, *does not effect a change in the date of the filing of the petition, the commencement of the case, or the order for relief.* (emphasis supplied)[1]

---

1. Neither subsection (b) nor (c) of § 348 is applicable in this case.

■ Therefore, following conversion of a debtor's chapter 13 case to chapter 7, the court is required to look back to the date of the filing of the original chapter 13 petition in order to determine what constitutes property of the chapter 7 estate. *In re Gorski*, 85 B.R. 155, 156 (Bankr.M.D. Fla.1988). Although a chapter 13 estate includes a debtor's postpetition earnings from services by virtue of 11 U.S.C. § 1306(a)(2), that section is rendered inapplicable to the definition of property of the estate upon conversion to chapter 7[2] and § 541 becomes the sole provision for defining the chapter 7 estate. *In re Lepper,* 58 B.R. 896, 898 (Bankr.Md.1986). Commencement of a bankruptcy case creates an estate, which generally is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). In particular, § 541 provides that a debtor's estate includes "proceeds, product, offspring, rents, or profits of or from property of the estate, *except* such as are *earnings* from *services* performed by an individual debtor *after* the *commencement* of the *case."* 11 U.S.C. § 541(a)(6). Therefore, the court finds that with respect to Ernestine Figgers' share account, only § 39.91 of the account was property of her chapter 7 bankruptcy estate. The remaining balance of the account represents earnings from services rendered after the commencement of the bankruptcy case on September 1, 1988, and is therefore not part of the estate.[3]

■ Defendant maintains that because the bulk of the share account is not estate property, there can be no violation of the automatic stay of § 362. Defendant's reading of the Bankruptcy Code is plainly erroneous and overlooks provisions designed to protect *property of debtors.* The filing of a petition in bankruptcy operates as a stay, applicable to all entities, of, among other things—

(5) any act to create, perfect, or enforce against *property of the debtor* any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim *against the debtor* that arose before the commencement of the case under this title;

(7) the setoff of *any debt owing to the debtor* that arose before the commencement of the case under this title *against any claim against the debtor.* 11 U.S.C. § 362(a) (Emphasis Supplied).

Despite the fact that Defendant was not listed in Debtors' original chapter 13 schedules, the automatic stay was effective upon the filing of Debtors' petition in bankruptcy; no formal notice was required. *Richard v. City of Chicago*, 80 B.R. 451 (D.N.D.Ill.1987); *Matter of Davis*, 74 B.R. 406 (Bankr.N.D.Ohio 1987). However, lack of notice may provide a defense to a claim under § 362(h) for damages arising from acting in violation of the automatic stay. *FSFG Service Corp. v. Kim (In re Kim)*, 71 B.R. 1011, 1015 (Bankr.C.D.Cal.1987). In any event, here, the court is concerned only with Defendant's conduct following conversion of the case to chapter 7 and the addition of Defendant as a creditor.[4]

■ Defendant contends that it possesses a security interest in Debtors' account by virtue of a pledge. Although Ohio's version of the Uniform Commercial Code does not govern the loan transaction in this case, the common law doctrine of pledge may be applicable in such situations:

[T]he court notes that Ohio's enactment of the Uniform Commercial Code (Ohio Revised Code Chapters 1301–1309) governs secured transactions. However,

2. While chapters 1, 3, and 5 of the Bankruptcy Code apply to cases under chapter 7, 11, 12 or 13, chapter 13 applies only in cases under such chapter. 11 U.S.C. § 103(h).

3. The instant opinion should not be construed to contradict *Ledford v. Burns (In re Burns)*, 90 B.R. 301 (Bankr.S.D.Ohio 1988), wherein the Hon. Thomas F. Waldron found that funds *deposited with the chapter 13 trustee* during administration of a chapter 13 case are distributed to creditors when the case is converted to a chapter 7 case. That issue is not presently before the court.

4. Debtors have made no claim for the weekly payroll deductions made by Defendant during the chapter 13 administration.

O.R.C. § 1309.04(K) (1984) excludes from its ambit an attempt to create a secured interest in "any deposit account." O.R.C. § 1309.01(A)(5) defines a "deposit account" as "a demand, time savings, passbook or like account maintained with a bank, savings and loan association, credit union, or like organization, other than an account evidenced by a certificate of deposit." Thus Article 9 of the UCC as enacted by the Ohio legislature is inapplicable. Nevertheless, O.R.C. § 1301.03 provides for the continued vitality of the general principles of law and equity and specifically provides that those principles should supplement Ohio's Uniform Commercial Code. As a result, the common law doctrine of pledge continues to have validity under Ohio law. *Homan v. Kemba Cincinnati Credit Union (In re Homan)*, 116 B.R. 595, 600 (Bankr.S.D.Ohio 1990).

The court notes that, here, there existed no clear agreement between Ernestine Figgers and Defendant to create a pledge. On the loan application form, next to a line designated as "Collateral Offered" is a handwritten notation—"signature"; in small print on the "Revolving Credit Application, Note, Plan, Agreement and Truth–in–Lending Disclosure" form is language purporting to grant a pledge in the shares and/or deposits of Ernestine Figgers.[5] It is agreed by the parties that Defendant made no special reference to a share pledge during the loan application process.

Where doubt exists as to the proper construction of a written instrument, it must be construed most strictly against the party who prepared it. *Smith v. Eliza Jennings Home* (1964), 176 Ohio St. 351, 199 N.E.2d 733. This rule has been equally applied to the construction of collateral pledge agreements. *Minerva*

*Savings & Trust Co. v. Lyder* (1930), 9 Ohio Law Abs. 20.

*Cullen v. Government Savings & Loan Co.*, 39 Ohio Misc. 125, 316 N.E.2d 498, 500 (Mun.Ct.1973). This court finds that the evidence establishes serious doubt concerning the intent of Ernestine Figgers to grant a pledge to Defendant; construing that doubt strictly against Defendant, who supplied the loan documents, the court finds that there is insufficient evidence of an intent on the part of Ernestine Figgers to grant a pledge of her share account to Defendant.

■ Even if Ernestine Figgers had intended to grant a pledge,

"[u]nder Ohio law both delivery of the pledged property to the pledgee and possession of the pledged property by the pledgee are essential to effectuate a common law pledge. Possession results when the pledgee has 'complete, unequivocal and exclusive' control of the pledged property." *In re Homan, supra,* 116 B.R. at 600.

Here, an examination of Debtors' account with Defendant demonstrates that Debtors made frequent deposits and withdrawals from the account. "The ability of the debtor-pledgor to withdraw funds at her convenience and to dissipate pledged property is inconsistent with the requirement that the credit union-pledgee exercise exclusive control over the pledged property." *Id.*

■ Most importantly, even if there had been valid pledge of the share account to Defendant, under the facts of this particular case Defendant's status would be little better than an unsecured creditor. Because of the effect of conversion, the amount of the account secured by the pledge would only be the balance of the account on the date Debtors filed their original chapter 13 petition ($39.91).[6] Sec-

---

5. Paragraph 8A of Defendant's form refers to an amount being entered on a "Revolving Credit Request Voucher" as a condition to the pledge. Defendant has offered no evidence that such condition was satisfied.

6. In its trial brief, Defendant states:
"[Debtors], however, in [their] discussion of the case law [have] omitted a key legal princi-

ple which is recognized in this circuit and throughout the country. When a creditor has been omitted form a petition, the pertinent date to determine a lender's offset/pledge rights (and most rights generally vis-a-vis the debtor) is the date the creditor was added in this case June 13, 1989."

tion 552, which governs the postpetition effect of security interests, prevents any property acquired by Debtors after filing their chapter 13 petition from being subject to the operation of the alleged pledge agreement: [7]

> This statutory scheme [§ 552] in essence means that a bankruptcy filing severs prepetition security interests with one important exception—security interests in property acquired prior to filing extend to proceeds of such property acquired by the estate after filing. *Matter of Mattice*, 81 B.R. 504, 507 (Bankr.S.D. Iowa 1987).
>
> Section 552(a) states the general rule that after-acquired property is not subject to any lien resulting from a security agreement entered into by a debtor prior to the debtor filing a petition in bankruptcy. The purpose of this provision is to facilitate a debtor's "fresh start" by enabling him or her to use after-acquired property free and clear of prebankruptcy liens. Section 552(b), however, recognizes a distinction between after-acquired property and proceeds generated from prepetition collateral. *In re Nielsen*, 48 B.R. 274, 276 (D.N.D.1984).

Here, with the exception of $39.91, all of the funds in Debtors' account with Defendant were deposited after Debtors filed their chapter 13 bankruptcy petition and those postpetition deposits are not affected by any security agreement existing at the time of filing. Therefore, even if a valid pledge had existed, the maximum value of such security interest would have been $39.91.

In the alternative, Defendant maintains that it has a right to setoff.[8] Although § 553 of the Bankruptcy Code preserves the common law right of setoff, in order to qualify for setoff the debts must be mutual[9] and they must be *prepetition*. *Moratzka v. U.S.* (*In re Matthieson*), 63 B.R. 56, 58 (D.Minn.1986); *In re Charter Co.*, 86 B.R. 280, 284 (Bankr.M.D. Fla.1988). For purposes of determining the amount of the share account that is subject to setoff, the court, again, looks to the date the original chapter 13 petition was filed rather than the date of conversion to chapter 7. *Oliphant v. Amarillo Pantex Federal Credit Union* (*In re Oliphant*), 40 B.R. 577 (Bankr.N.D.Tex.1984). On the date the petition was filed, the only sums owed by Defendant to Ernestine Figgers was $39.91. Any other funds in the account represent postpetition amounts, and thereby a postpetition obligation of Defendant, and are not subject to setoff by Defendant.

With respect to the "freeze" imposed on Debtors' funds by Defendant after it had been added as a creditor and received notice of Debtors' bankruptcy filing, the court finds, in accordance with the well-reasoned decision of *In re Homan, supra,* that Defendant has violated the automatic

Defendant has offered no legal authority to support this proposition, and the court, based on its review of the case law, rejects such proposition.

7. (a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise. 11 U.S.C. § 552.

8. "Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case...." 11 U.S.C. § 553(a).

9. From the account statements it appears that some of the deposited funds belonged to Jacqua Figgers. There is, of course, no mutuality as to those amounts.

stay of § 362. Although Judge Waldron's observations were made in regard to the "freezing" of *estate* property, they are equally applicable to actions involving assets of debtors:

The assertion that a creditor, with a potential secured claim as a result of an alleged right to setoff, can, post-petition, freeze a debtor's account without the Bankruptcy Court's approval is inconsistent with the purposes and provisions of the Bankruptcy Code.... Congress placed the court at the vortex of bankruptcy proceedings and the provisions of the automatic stay are designed as the initial channels that regulate the flow of economic consequences, which, if left unchecked or diverted by extra judicial determinations, would drown a debtor's opportunity for a fresh start and destroy a creditor's opportunity to receive its hierarchically ordered claim to a pro rata share of the bankruptcy estate.

. . . .

A creditor cannot assert some interest in the debtor's funds on deposit and resort to self-help to preserve that claimed interest. Rather, the required course of action, mandated by the Code, is for the creditor to initiate a filing to obtain relief from the automatic stay.... The bank by placing an administrative freeze on the debtor's account, without obtaining a court order, impermissibly encroaches upon the authority assigned by Congress to the Bankruptcy Court.

. . . .

... In these or similar situations, this court determines that, if the financial institution wishes to place an administrative freeze or a hold on a Chapter 13 debtor's funds on deposit, simultaneous with any such proposed exercise of control over the debtor's funds, the Code requires the financial institution to seek a judicial determination of the relative rights of the parties with respect to the funds and an immediate order from the Bankruptcy Court modifying or conditioning the stay to permit the financial institution to freeze or hold the funds pending the court's resolution of the issues presented. *In re Homan, supra,* 116 B.R. at 603–605.

Specifically, this court finds that Defendant's refusal to release the funds to Debtors was an attempt to collect or recover Defendant's prepetition claim against the Debtors which is prohibited by § 362(a)(6). In addition, Defendant attempted to enforce a lien against Debtors' property in contravention of § 362(a)(5). The question of whether Defendant is still entitled to setoff $39.91 and the issue of damages under § 362(h) for violations of the automatic stay will be determined at a later hearing.

For the foregoing reasons, the court finds that Dayton Power and Light Employees Federal Credit Union has violated Section 362(a) of the Bankruptcy Code and ORDERS Defendant to turn over all amounts in excess of $39.91 in the subject account to Ernestine Figgers.